*Page 1 of 2 (ex.A)*

*Ex.1 (3)*

1. Criminal Law ⚖ 1208.6(6)

Corpus delicti rule, requiring that corpus delicti be established by prosecution independently from extrajudicial statements, confessions, or admissions of defendant, does not apply to sentence enhancements for a defendant who commits certain offenses with knowledge that he has AIDS or with knowledge that he carries antibodies of HIV; positive were sufficient to support enhancement of defendant's sentences for his convictions for forcible sodomy, forcible oral copulation, and rape by means of force.

Affirmed.

1. Criminal Law ⚖ 1208.6(6)

Corpus delicti rule, requiring that corpus delicti be established by prosecution independently from extrajudicial statements, confessions, or admissions of defendant, does not apply to sentence enhancements for offenses committed with knowledge that he has acquired immune deficiency syndrome (AIDS) or with knowledge that he carries antibodies of human immunodeficiency virus (HIV). West's Ann.Cal.Penal Code § 12022.85.

2. Criminal Law ⚖ 1208.6(1)

Enhancement does not define a crime but merely imposes additional punishment for crime when certain circumstances are found to exist.

3. Criminal Law ⚖ 1036.1(2)

Defendant did not preserve for appeal his multiple 'hearsay' objection, where defendant failed to raise the objection at time his extrajudicial statements were offered into evidence. West's Ann.Cal.Evid.Code § 353.

4. Criminal Law ⚖ 1208.6(6)

Defendant's statements acknowledging that he either had acquired immune deficiency syndrome (AIDS) or was human immunodeficiency virus (HIV) positive were sufficient to support enhancement of part I,

---

The People, Plaintiff and Respondent,

v.

Samuel Lee SHOEMAKE, Defendant and Appellant.

No. F017527.

Court of Appeal, Fifth District.

June 1, 1993.

Rehearing Denied July 1, 1993.

Review Denied Aug. 26, 1993.

Certified for Partial Publication.*

MARTIN, Acting P.J., and VARTABEDIAN, J., concur.

DISPOSITION

---

* Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for partial publication with the exception of part I.

defendant's sentence for his convictions for forcible sodomy, forcible oral copulation and rape by means of force. West's Ann.Cal.Penal Code §§ 245(a), 261(2), 286(c), 288a(c), 667.6(b), 667.8(a), 1192.7(c)(3, 4), 12022.85.

---

16 Cal.App.4th 247

Daniel E. Lungren, Atty. Gen., Mary Jane Hamilton, Deputy Atty. Gen., Sacramento, for plaintiff and respondent.

LaKiyie Gee, Oakland, for defendant and appellant.

OPINION

ARDAIZ, Associate Justice.

On August 23, 1991, an information was filed in Kern County Superior Court charging appellant Samuel Lee Shoemake with two counts of forcible sodomy in violation of Penal Code section 286(c), one count of forcible oral copulation in violation of Penal Code section 288a(c), and one count of rape by means of force in violation of Penal Code section 261(2).[1] Both the rape and sodomy were alleged to be serious felonies within the meaning of section 1192.7(c)(3)-(4). It was also alleged, as to each count, that appellant had committed each offense with knowledge that he had acquired immune deficiency syndrome ('AIDS') or knowledge that he carried antibodies of the human immunodeficiency virus ('HIV'), in violation of section 12022.85. It was further alleged that appellant had previously been convicted of two counts of forcible rape and that he had not remained free from prison custody for a period of ten years thereby giving rise to four enhancements under section 667.6(b). The information also alleged that appellant kidnapped the victim for the purpose of committing the above-referenced sexual offenses thereby giving rise to four enhancements under section 667.8(a). Finally, it was alleged

that appellant had previously been convicted of a serious felony, to wit: assault with a deadly weapon in violation of section 245(a) thereby giving rise to four enhancements under section 667(a).[2] Appellant entered a plea of not guilty to all charges and denied each of the allegations.[2]

On October 25, 1991, the trial court denied appellant's motion for change of venue. The court did, however, grant appellant's section 1538.5 motion to suppress and ordered that the fruits of appellant's warrantless arrest be suppressed (i.e., his clothing, statements, and blood sample).

The matter proceeded to trial on November 21, 1991. A mistrial was subsequently declared because three jurors read a newspaper article over the weekend that contained evidence regarding an issue that had been ordered bifurcated from the guilt phase of the trial (i.e., the AIDS enhancement).

Jury selection started anew the same day. On December 3, 1991, after only two days of deliberation, a mistrial was declared because the jury was unable to reach a verdict. Appellant moved for dismissal, but the trial court denied the motion.

The third jury trial began on January 28, 1992. During voir dire, a total of 12 venire persons were excused for cause. Of these venire persons, one was an African-American male while the other was an African-American female. The only remaining African-Americans from the venire challenged at the prosecutor exercised one of his peremptory challenges. Appellant immediately filed a Wheeler motion.[3] The court heard and denied his motion outside the presence of the jury because, in its opinion, appellant failed to make a prima facie showing of 'systematic exclusion' of African-Americans from the venire. Appellant challenged the prosecutor brought a Wheeler motion chal-

---

1. All statutory references are to the Penal Code unless otherwise indicated.

2. The Clerk's Transcript on Appeal does not contain any information regarding appellant's plea. However, appellant's entry of a plea can be inferred from the fact that the jury was asked to determine each of these issues.

3. People v. Wheeler (1978) 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748. For purposes of appeal and the victim are African-Americans.

Page 2 of 12 (Exhibit A)
Case 3:10-cv-01236-WQH-NLS   Document 1-1   Filed 06/07/10   Page 2 of 61

lenging appellant's removal of female venire persons. This motion was denied as well.

At the close of the People's case, appellant brought a section 1118.1 motion for entry of judgment of acquittal based on insufficient evidence of legal guilt. The court found that there existed a "plethora" of evidence which, if believed, would support the charges and accordingly denied the motion.

The case went to the jury and, on February 4, 1992, they found appellant guilty on all four counts. The jury also found the kidnapping enhancement under section 667.8(a) to be true.

The bifurcated portion of the trial began on February 5, 1992. The following day, appellant unsuccessfully moved to have the appellant's allegation (section 12022.86) stricken. Later that day, after a few hours of deliberations, the jury found the AIDS allegations, the prior Wheeler enhancements under section 667(a) and section 667(6b) allegations.

On March 12, 1992, the trial court denied appellant's motion for a new trial. Probation was denied and appellant was sentenced to state prison for a total of 72 years less appropriate time credits.

Appellant timely filed his notice of appeal on March 17, 1992. Appellant presents four arguments on appeal. First, he claims the trial court erred when it denied his Wheeler motion. Second, he maintains that, as a matter of public policy his claim should find that the "corpus rule" applies to section 12022.85 status enhancements. Third, appellant insists that some of the evidence relied upon by the prosecution to prove the AIDS allegation should have been excluded because it was inadmissible hearsay. Finally, irrespective of the court's conclusion regarding the two prior arguments presented, appellant claims that insufficient evidence exists to support the AIDS enhancement.

At approximately 8:30 p.m. on July 28, 1991, Estella O. was visiting with her boyfriend and some teenagers. She consumed three beers and had one "hit" of rock cocaine over the course of the evening. Shortly before 1:00 a.m., the victim got into a fight with her boyfriend after which she decided to go to an after-hours club by herself.

Meanwhile, appellant and Ms. Howard, appellant's live-in girlfriend, had been drinking at the Cotton Club and around 1:15 a.m. on July 29, 1991, appellant brought Ms. Howard home because she was feeling nauseated. He then returned to the club using her vehicle.

At about this same time, the victim saw appellant, one of her brother's high school classmates, and asked him to give her a ride to the Cowboy Club. He agreed.

Initially, appellant drove in the direction of the club. After some friendly conversation, the victim said that appellant began to look funny and that she became scared. She asked him if he was going to hurt her and he responded, in part, by punching her in the left eye.

Appellant did not take the victim to the club as promised, but instead took her against her will to Casa Loma Park. After parking the car, appellant got out and urinated. He then came around to the passenger side of the vehicle and ordered the victim to get out of the car. He pulled her out of the car and struck her again in the face. When she began yelling, he told her to "shut the fuck up."

After forcing the victim into position, appellant proceeded to sodomize her. He then turned her around, struck her on the right side of her face, and forced her to orally copulate him. After a few minutes, appellant repositioned the victim, struck her again. When she opened her eyes, the victim realized that appellant had backed away from her and had his eyes closed so she tried to escape.

She began running, but tripped over a sprinkler. Appellant caught up with her, pulled her off the wet grass, and dragged her back to the passenger side of the vehicle. She consumed her to let her co- and continued to let her. He shut the fuck up...

Appellant then turned the victim around and sodomized her for a second time. The victim said she believes this second act of sodomy caused her to defecate. She also said that she bled anally although she could not say when the bleeding actually began.

Still dizzy from the multiple blows, the victim tried to hug appellant and ask him why he was doing this to her. Whereupon, he pushed her back into the car and proceeded to rape her. After a short time, he needed to urinate again. As he withdrew his penis, pulled her out of the car, and struck her. As before, appellant closed his eyes and backed away ever so slightly. Having noticed that she was temporarily distracted, the victim took advantage of the situation and fled the area of the assault.

She managed to reach a nearby house and began pounding on the front and then the rear door. She was crying hysterically and pleading with the occupants of the house to let her inside. Due to her appearance, they would not let her inside but did telephone the police.

Deputies with the Kern County Sheriff's Department arrived on the scene around 2:00 a.m. Detective Giuffre arrived a short time later and took over the investigation of the case.

The victim, he first made contact with the victim, he noticed that her face was swollen as if she had been in some sort of altercation. He also noticed that the back of the victim's dress was stained with blood and fecal matter. The victim was hysterical, angry, and crying. She did not appear to have been at approximately 2:00 a.m.

Ms. Howard indicated that appellant returned home at approximately 2:00 a.m.[7]

be under the influence of crack cocaine. After obtaining a brief statement at the scene, Detective Giuffre accompanied the victim to Kern County Medical Center (KMC)[8] so that a sexual assault examination could be performed. He also arranged for photographs of the victim to be taken while at KMC.

The sexual assault examination was performed by Ms. Mohloog, a registered nurse who had received specialized training in the methods used to gather physical evidence in sexual assault cases. During the examination, the victim complained of pain emanating from her forehead, nose, collarbone, chin, and top of her head. She also complained of extreme tenderness during the rectal examination. Physical examination revealed a lacerated chin, scratches under the left eye, ecchymotic[9] areas on the inside of both cheeks, petechiae[8] on the inside of the left cheek, non-motile sperm in the vaginal "vault," fecal material on the right buttock, and a raised and abraded portion of the anus. The nurse did not find any evidence of rectal bleeding. Woods lamp[9] examination[9] revealed areas of fluorescence on the victim's cheeks and inner thighs. The nurse collected the samples necessary to complete the rape kit and turned them over to the appropriate law enforcement agency.

Meanwhile, Detective Giuffre returned to the scene where the incident was alleged to have occurred. He was unable to find any physical evidence that would assist him in his investigation.

Diane Woods, an evidence technician, examined the suspect vehicle around noon the same day, July 28, 1991, but did not find any evidence that could confirm that the claimed sexual assault took place in or on the vehicle.

---

[1] In the unpublished portion of this opinion, we conclude there is no basis for reversal for Wheeler error.

[5] Hereinafter referred to as "the victim."

[8] "[M]inute hemorrhagic spots of pinpoint to pinhead size, in the skin..." (Stedman's, su-pra, at p. 1174.) According to the nurse con-ducting the examination, petechiae can be caused by friction.

[9] A Woods lamp is used to illuminate parts of the body where, based on the patient's history, saliva or semen is expected to be found. The area will fluoresce if these bodily secretions are actually present.

[7] Relating to "[a] purplish patch caused by ex-travasation of blood into the skin..." (Sted-man's Medical Dictionary (25th ed. 1990) p. 484.)

STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS & REHABILITATION
CLASSIFICATION CHRONO, CDC-128G

| NAME: BOOTH, M. | CDCR# G27872 | HOUSING: F2-08-128U |
|---|---|---|

| RELEASE DATE | CUSTODY | CS | WG | PG | ANN REV | MHSDS | DDP/DPP |
|---|---|---|---|---|---|---|---|
| EPRD 2/6/2011 | MAX | 19 | D1 | D | 8/09 | CCCMS | NCF/N/A |

## COMMITTEE SUMMARY

**INITIAL REVIEW / SAFETY CONCERNS / REF CSR TX: MCSP-II-SNY, alt: CRC-II-SNY**

### INTRODUCTION

Inmate Booth (I/M) made a personal appearance before the Institutional Classification Committee (ICC) for the purpose of an Initial Review. I/M stated he was feeling well enough to proceed with committee. I/M meets criteria for inclusion in the MHSDS. Level of care: CCCMS. DDP: NCF. Reading GPL: unknown; however I/M demonstrated he had a firm grasp of reading and comprehending English. CID status noted.

### ASU REASON:

I/M was placed in ASU on 6/21/09 after claiming safety concerns at RJD-III-SNY gym.

### 4D REVIEW:

The CDC-114D administrative review was conducted on 6/22/09 (Monday), by W. Suglich, Facility Captain. I/M's "caseworker" (CC-I Ortiz) was assigned as Staff Assistant (SA). An Investigative Employee (I.E.) was not assigned. No witnesses were requested. I/M waived his 72-hour time preparation period. Reviewer acted to designate double-cell status and retain I/M in ASU pending ICC review.

### STAFF ASSISTANT (SA):

Mental Health (MH) staff described I/M's treatment needs and likelihood of decompensation if retained in ASU. Refer to CDC 128-C dated 6/24/09. MH staff said SA is not necessary, as I/M is able to comprehend the issues. Therefore, ICC unassigned the SA.

### ICC DELIBERATION & ACTION:

ICC noted that I/M has fluctuated back and forth on whether he has felt safe in the gym environment at RJD-III-SNY, where he is endorsed. On 9/30/09 I/M convinced Facility Three UCC that he required hard cell living. UCC subsequently referred I/M's case for a Level-IV override; however the C&PR pulled the case months later after other SNY-CID housing options became available in CDCR. Additionally, after the aforementioned UCC action, I/M approached classification staff asking to remain in the gym, as noted on 128-B dated 3/4/09. On 6/4/09 Facility Three UCC referred I/M for transfer to MCSP-II-SNY (CID).

Today ICC repeatedly asked I/M about specific enemy concerns, and the reason for the concerns. I/M remained very vague and would not or could not identify a specific enemy concern. Ultimately ICC members realized they would likely learn very little from I/M. Again, in reviewing I/M's fluctuating gym safety concerns over the past several months, coupled with the problems I/M's homosexuality and feminine appearance could bring in the gym, **ICC erred on the side of caution and retained I/M in ASU. Also ICC referred this case to the CSR for transfer: MCSP-II-SNY(CID), alt: CRC-II-SNY(CID).**

### CASE FACTORS:

IM's custody increased from MEDA to MAX. I/M's prior WG/PG was A1/A effective 8/1/08. I/M's current WG/PG is D1/D. Confidential file is clear. I/M's historic case factors are noted on 128-G dated 9/30/08. Transfer is not adverse. Upon transfer I/M will remain MEDA and A1/A.

### CELL STATUS:

I/M was approved for double-cell status as he has not demonstrated a pervasive pattern of in-cell violence. I/M was placed on the Walk Alone exercise yard for safety concerns (SNY).

### PARTICIPATION:

The Use of Force policy was explained to I/M. I/M participated in today's hearing and indicated he understood ICC's decision, and agreed. I/M said he could not return to Facility Three. MH staff concurred with ICC's decision. I/M is satisfied with his cell status and exercise yard designation. I/M agrees with the transfer recommendations. I/M was advised of his appeal rights.

### COMMITTEE MEMBERS

R. STAUSS, AW (A);   C.P. NEWMAN, CC-III (A);   D. HUFFMAN, PSYCHOLOGIST

E.A. CONTRERAS, CDW (A)  CHAIRPERSON

P.A. CORTEZ, CC-II  RECORDER

| DATE: 6/24/09   (pac) | CLASSIFICATION: ICC / CSR / ASU | INST: RJDCF-IV |
|---|---|---|

ICC-RETAIN   REVISED 3/07

*Exhibit B*

Michael J. Booth, G27872   Federal Office bld

C.R.C. Prison, 405-18$^{Low}$   880 Front $^{st}$, Ste 4290

P.O.Box 3535   San Diego, Ca

Norco, Ca. 92860   92101-8900

United States District for the
Southern District

| Michael J. Booth<br>Plaintiff<br><br>v.<br><br>Mr Bolding,<br>Correctional Officer<br>Mr. Armstead,<br>Correctional Officer<br>John Doe,<br>2 Nd watch sargent<br>for bld 8 of facility 2<br>at R.J.D. Prison on<br>June 26, 2009<br>George Neotti, Warden<br>Individually and thier<br>official Capacities<br><br>Defendants | Case Number<br><br><br><br><br>Declaration<br><br>Made   By<br><br>Michael J. Booth<br><br>S.S.I #, 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<br><br>"Exhibit-C" |
| --- | --- |

Page 1 of 19

1) Michael Joseph Booth declares:

2) On 6-21-09 I was trasferd from the 3 yard gym at, RJDonovan Prison, to the hole on the 2 yard for my safety

3) On 6-22-09 C.O schorr came to my cell and asked me if I wanted to be mr shoemake's cellie. I asked, "is he white?" He said, "no but he is an allrigt guy." I asked "what if I dont want to?" He said "You could get a 115 for refuseing a cellie." I said "O.K. whom-ever you want me to be to be cellies with is ok."

4) An houre later Hernandez came and moved me to cell 128. The cell shoemake was in.

5.) At about 10pm on 6-24-09 he Caught a litle mouse and held it by its tail and said "I am god!" Then he went on bragging about how easaly he could take its life. And then he grabed it and squeezed it really hard and thru it in the toilet and just left it there watching it drown. Then after it drowned he flushed the toilet.

6.) During the day of 6-25-09 Shoemake, made jokes that referd to him and I in a sexual contex.

7.) Latter that same day mrs.Dunglish a Mentel Health staff member had me pulled out of my cell. Among other things I told her I was uncomfortable with my cellie. She said she didnt think any thing could be done, but she would speak to custody.

8.) After dinner that day shoemake asked me if I knew how to sew. I told him yes but I had no needle. He said "Yes you do!" and slamed my "Asthmanex" in-haler on the ground. He picked up a coiled piece of steel & said he could make this into one. So I sat there & watched him straighten it out to about a foot long. Then he put an eye on one end of it and sharpend the other end. All His took about an houre. However it worked as a some what needle.

9.) latter that night he went to the Bathroom naked. He was hard. I simply told him to get dressed and put that thing away. So he got on his bed.

10.) After lights out that night he caught

another mouse. He toyed with it swinging it
from side to side and thumping on it. Then he
squeezed it and thru it in the toilet and
watched it drown. Then he flushed the
toilet.

11.) some time after lights out shoemake
got up to use the bathroom. As befor he was
Naked I had an erection. As befor I simply
told him to get dressed and put that thing
away. Then I turned over to go to sleep.
But he didnt get dressed. He did slap me
on my butt and said "come on girl. You
know you want this." Thats when I
got scared. So I sat up & pulled my knees
up to my chest and wraped my arms
around them. He said something like come
on girl and get this. I said no thank You
I really dont want to. He said "Bitch you
dont have a choice!" Then he grabed my
ankle and yanked my leg off the bed. So
I got off my bed. He stepped closer
to me. I stepped back untill I was against
the table. He was very fast. Befor I knew
what was happening he had ahold of my
hair & was forceing my face into the
pile of bedding on his bed. I was trying
to scream. But I couldnt scream loud
enouph. He was holding my head down in the

Page 4 of 19

bedding, and trying to pull my boxers down at the same time. I was screaming for help, and trying to keep him from pulling my shorts down. Then he just stopped. He let go of my hair and let me up. I was crying. Then I saw him get that foot long piece of sharp steel. I just froze, I stopped crying and everything. I thought he was going to kill me. He didnt say anything. He just came over to me, turned me aroun pushed me over and pulled my shorts down. I saw him grab his penis. I closed my eyes. I just wished him away. But he didnt go away. Then I felt his hand on my back. I felt the head of his penis on my hole. I think he had A.&.D ointment on it because when he rammed it inside me. It slipped right in. He was saying that I really enjoyed what he was doing. But all I could think of was some one please help me. But no one did. Thier was alot of pain. It hurt so bad that I yelled really loud. It must have been prety loud because he put the shank up to my face and said "Shut up bitch and take this dick." So did what he said. But when he rammed me harder I couldnt help the yelp that came out. This didnt make him mad. He just kept ramming his penis harder and harder. Then he just stopped. He didnt say anything. He just

went to the sink, I think to wash himself
off. All that I could think of was I hope
this is over. I climbed on my bed. I was
crying and asking god why me. I was curled
up on my bed in the corner. I didnt have
any idia what I did to make him so mad at
me that he would do this to me. Then He
said "shut up bitch!" So I layed there quietly
crying. He had that shank in his hand. He
was paceing the cell. Then he pointed the
shank at me and orderd me to "come finish
what you started!" I said "I didnt start
this." Then I begged him "Please dont hurt
me any more." He said he was going to
hurt me and I was going to like it. He
stepped closer to me so I got off my bed.
I was still crying. He told me to shut up.
and turn around. I did as I was told. He
pushed me over and pulled my boxers down
agian. He grabbed my hips with both hands
and rammed his penis inside me agion. He
is very big. I hurt alot. He rammed me several
times then he pulled my hair. He was still
inside me, but he wanted me to stand up
straight. So I did. I was still crying. Then he
just pushed me away. As I went forword
his penis came out of me and I bumped
my knees on the seat of the table. I just
climbed back on my bed and cureld up.

Page 6 of 19

on my bed agian. I was crying and hopeing he was done. But he wasnt done yet. He was paceing the cell agian. Then he stoped and told me to get back down. So he told me to get on his bed on my Knees. So I did. This time when he penatrated me he was slower and even gentle. He would push slower and deeper. It took my breath away. I was breathing like a pregnant woman. to stop from yelling. This time he lasted much longer. Then finealy he stopped and pulled out of me. The He told me to get in my bed. I was very sore, I closed my eyes and hoped he was finnished. I went to sleep.

12.) The morning of 6-26-09 I woke up and he was standing on the seat of the table with that shank in his hand. He said that if I tried to tell anybody what happend he would Kill me befor they got in the cell. I believed him. I simply smiled at him and said "Baby why would I tell Anybody anything?" I dont think he believed me, but he left me alone. I Knew I had to play along untill I could get out of the cell. Then I would start screaming untill someone HAD to do something.

13.) After breakfast that same day Walter Lucus was in the cage infront of the cell I was in. He was getting his morning breathing treatment. Shoemake was telling him about the night befor. They are both "crips". Then Shoemake asked me if I wanted to talk to this guy. So I went to the door. Lucus asked me "Hey baby did you have a good time lost night?") I just smiled and nodded my head yes. Shoemake told me to ask him if I could be his. He said he had to ask Shoemake. So Shoemake got to the door and Lucus said "your girl wants to come up there with me." Shoemake said "if you want the bitch you can have her". Then Hawthorn said he would take me. They were talking as if I was some kind of property. Not a human being. After some-time Shoemake told me that I would be going to Lucus. Shoemake told me to tell the cops I wanted out of this cell and that I wanted to go to Lucuses cell.

14.) At Noon pill call of 6-26-09 I asked C.O.Silva if I could leave this cell. Silva asked "Why?" Shoemake was rite behind me. He told me to say I was haveing.

Page 8 of 19

psych problems. And I needed out of this
cell. So thats what I said. He said O.K.
and walked away.

15.) Then I saw C.O. Chacone and
told him I was haveing problems and
really needed out of this cell. He said
O.K. and went into the sargents Office.

16.) The sargent came to my cell and
asked me "What's Your Fucking Problem!" I
told him I was haveing real problems and
that I really needed out of this cell. He
Said OK. and walked away leaving me
alone in the cell with shoemake.

17.) Shift-Chang had just finnished and
I saw C.O. Armstead. I got his attention
and told him "I was haveing real problems
and that I really needed out of this cell.
He said O.K. Then he went to C.O. Bolding.

18.) C.O. Bolding came to the cell and
asked, "What seems to be the problem?"
I told him I was haveing real problems
and I really needed out of this cell.
He said that I needed to find another
cellie. I emidiatly told him "cell 224
Walte Lucus." He said he would check.

it out. Bolding returned a short time
latter to inform me that Lucus was.
ad-seg due to Battery on an inmate.
So he could not have a cellie. I told
him o.K. that I had another person
he could check out. So I told him
about a white crip named collins
in cell 114. Bolding returned a
short time later and told me collins
was allso adseg due to Battery on
and inmate and could not have a
cellie. So I told him about Hawthorn
in the cell rite next to me 127. Bolding
returned a short time later to tell
me that Hawthorn was scheduled to
return to facility 3. So he would put
a bed move in for me to move into
the empty cell. Then he walked away
leaving me alone in the cell with
shoemake. I never moved into that empty
cell.

19.) Shortly after lights out on 6-26-
09 shoemak went to the door. He was
looking out the window. He had his
hand in his boxers rubbing his penis.
Then he pulled his penis out of his
boxers and told me to "suck my
dick." So I went and sat on the

Page 10 of 19

toilet. He put it on my lips. So I opend. my mouth and tried to hold it with my hand. He slapped my hand away and said no hands. Then he put it in my mouth. Then he pulled it out of my mouth. Then he put his hand on the back of my head and pushed it to the back of my mouth. Then he forced it down my throte. He made about 4 or 5 thrust never leaving my throte. I couldnt breath. Then he pulled back untill the head was in my mouth. Then he came. Then he pulled me up by the back of my hair and put his face rite next to mine and jerked my head and said "swallow bitch swallow!" So I did. Then I smiled and said "thank you baby." He didnt say a word. He just went to bed. I brushed my teeth and went to bed.

20.)  Befor breakfast on the morning of 6-27-09. Hawthorn was escorted to and from showers by C.O. Pinmetel. Pinmetel skiped my cell for showers. Hawthorn told shoemake that C.O. Armstead & Pinmetel wernt going to give us showers because they didnt think I would go back in the cell. Shoemake told me to tell the cops that I wouldnt give them any funny biz. He said if we didnt

_shower that I would be the reason._

21.) So when Armstead came to the cell, and asked "Are you all packed?" I said what do you mean. Armstead stated "I know you guys were haveing issues yesterday. But your not going to give me any problems today, are you?" I said "no funny biz! I promis." Armstead Looked at shoemake, smiled and said "lets go shower."

22.) Some time in the afternoon shoemake fished a package from Lucus. It was Na Na's.

23.) After dinner that same day shoemake crushed the pills and mixed them with some coffie. He asked if I wanted some. I said "no thank you."

24.) After lights out he said "come on." I said "here I come." He was sitting naked on his bed with a herd-on. I put my blanket on the floor between his feet. Then I got on my knees. This time he niether helped me, nor did he slap my hands away. When I put my hand on his penis it was shakey. But as I put his penis in _my mouth they stopped shakeing. So I was._

able to keep my hond on his penis. So I. didnt let it go down my throte. I gave him head and jacked him at the same time. He lasted a long time about 15 or 20 min. then he came. It was alot. I had to swallow two times. Then I said "Thank you baby." I started to climb up on my bed. Then he yanked my boxers down and said we aint finnished yet. He said get over here and bend over. So I did. I tried to relax so it wouldnt hurt. I guess he senced it because he was much more gentle he eosed himself in me. I felt him gently caressing my back. He was slowly getting deeper and deeper with a grinding motion. Then I felt his pelvis push up against my butt. Then he stopped pushing in and back. He just grinded inside me. I realized he was all the way inside me and it wasnt hurting. Then He started long slow thrust pulling all the way out then slowly pushing all the way in. He was softly rubbing my back. Then he slid his hands down to my hipps and pulled his penis all the way out. Then he rammed it all the way in so hard that my body lurched forward. I hit my head on the wall. But he had a very firm grip on me. So he just pulled me rite back onto his penis. This.

Page 13 of 19

time it seem even harder and deeper. I could
not believe the pain, Every time he rammed
me he Would just pull me rite back, and
ram me agian. I must have blacked out
or something because the next thing I
remember, I was sitting on the toilet. I
was coverd in shit from my butt to my
feet, There was shit all over the floor.
He had to keep pounding after my body
gave way. He was standing at the sink
washing himself off. Then he laid down
with a T-shirt over his face, He told me
to clean up my mess. So I was sitting
on the floor naked cleaning shit off the
floor. The cop came by for count. If he
noticed anything wrong he didnt even
slow down to see what it was. My body
Was shakeing all over as cleaned the floor
then me. Everything was kind of Hazy. Amost
like I was stoned or something. I was
Kind of numb. I felt no pain. As I was
takeing a bird-bath he told me to "make
sure you clean that Nasty Fucking Ass of
yours." He had a small squeez botle that
he told me to duch with. He wouldnt let
me pull the curtin. Then when I was
finnished he told me to get on his bed.
So I started to get on my knees, He told
me "no! On your back." So I did, Then I,

Page 14 of 19

put my legs up, And as he put my legs
over his shoulders, he said you wont be
doing any running this time, Then just
like befor he was easy and gentle as
he penatrated me. He was very gentle,
long slow and grinding. Then just when I
was relaxed he slammed it really hard
and deep, It was so hard that it took
my breath, But I felt absalutly no
pain, He just kept going faster and
harder, I was trying to breath. Then he
just stoped and said "go wash that cum
out of your ass." So I did, then I
climbed up on my bed, I was so scared
becouse I had no pain, I thought for
sure he broke something inside me, I
couldnt sleep, I kept expecting my
belly to start hurting from internal
bleeding. But it didnt, I was just
numb,

25.)    When breakfast came on the morning
6-28-09, Shoemake took the meat off
my tray and said that he had worked up
a real hunger. So I just sat there and
ate what he let me have,

26.)   That same after noon a psych-teck
made rounds, She was offering puzzels

Case 3:10-cv-01236-WQH-NLS   Document 1-1   Filed 06/07/10   Page 19 of 61

to any one that wanted them. When she
came by the cell I was in, I was at
the door. When she saw me, I must have
looked prety bad, because she stopped
and asked if I was allright. I
shook my head No, She asked "What's
wrong?" I wisperd,"I really need to
see the doc." She said,"ok I'll pull
you out." Then she walked away. I
thought shoemake was asleep. But he
wasnt. He was up, out of bed and had
me by the back of my hair befor I
ever realized he was awake. He told
me to call her back and tell her I
didnt need to see any one. I said,"you
told me to tell them I was haveing psych
problems." He shook my head and said,
"I said tell her!" So I called her back
and told her that I didnt need to see
any one. She asked,"Are you sure?" Shoemake
was now sitting on the toilet. I looked
at him and then back at her and told
her,"I'm shure." She said,"ok. well you
know how to get ahold of us if you
need us." I nodded yes. Then she
walked away leaveing me in that cell
alone with him. All I could think was
lady please dont go. But she did

Page 16 of 19

26.) That night after lights out Shoem-
ake was standing Naked at the door. So,
I got down and sat on the toilet and,
put his penis in my mouth but he didnt
want that, then he told me to turn around.
So I did. I didnt resist at all, I just
relaxed. He was very fast, Only a few
thrust and then he came. I knew the
next day was monday and I might get
my chance. I had to make him feel
safe. So I told him I was prety good
at giveing massages. So he layed down
on his bed and I gave him a massage.
Then I went to bed.

27.) The morning of 6-24-09 I woke
up to an odd sound. As I looked around
I saw shoemake standing by the door
scrapeing that foot-long piece of steel
on the wall. He had cut it into two
pieces, Now he had two shanks about
6 inches long. Then just befor C.O. Griffen
got us for showers, Shoemake had put one
under my pillow and he had one wrapped
up in his towel, He made me go first, into
the showers and back to the cell. When
we got back to the cell we ate breakfast
and then he put both pieces of the
shank in the vent. Then he started

Page 17 of 19

telling C.O. Griffen that he was haveing chest pains. I was praying they would take him out of the cell. And then they did.

28.) I started yelling at C.O. Griffen. I told Griffen "My cellie was hurting me!!!" Griffen stated "Your cellie isnt in there rite now. So relax." I asked Griffen "Your not going to put him back in hear are you?" He stated "I dont have time for your shit." And then walked away.

29.) I saw C.O. Hernandez. I started yelling his name. He came over to the cell. I told him "my cellie is hurting me." He asked "How." I said sexually. He said "O.K. Dont worry. Your O.K. Now." Then he went into the sargents office. Then Sargent Ive's came over to the cell and asked "whats wrong?" I told him "my cellie is hurting me sexually." He said "O.K. We got you." Then Ives told the tower to "put a cap on cell 128." Then Hernandez put me in hand-cuffs and took me out of the cell and put me in the isolation cage. Thats when I fell to the floor and started crying uncontrolably.

Page 18 of 19

30.) A litle later Surgent Ives came and asked me to tell him what happend. I was crying so hard I could hardly talk. But I tried anyway. He told me just relax we can do this later.

31.) A litle later I had stopped crying so I asked to talk to Ives. He came over to me. I stunted to tell him the whole thing. He said that some one els would do a vidio interview. I told him "OK., But you need to get the shanks." He stopped cold. And asked "Where are they?" I told him. He told C.O. Scharr to go get them. C.O. Scharr went rite to the cell and got them.

32.) A couple of hours later I was taken to an outside Hospital for a S.A.R.T. exam.

33.) I declare under penalty of perjury that the forgoing is true and correct.

Executed at Norco, California on April 20, 2010

Michael J. Booth
Name

Signed



CALIFORNIA
**VCGCB**
Victim  Compensation  &  Government  Claims  Board

STATE OF CALIFORNIA
ARNOLD SCHWARZENEGGER, Governor

GOVERNMENT CLAIMS PROGRAM
400 R Street, 5th Floor ♦ Sacramento, California 95811
Mailing Address: P.O. Box 3035 ♦ Sacramento, California 95812
Toll Free Telephone Number 1-800-955-0045 ♦ Fax Number: (916) 491-6443
Internet: www.vcgcb.ca.gov

FRED AGUIAR
Secretary
State and Consumer Services Agency
Chairperson
JOHN CHIANG
State Controller
Board Member
MICHAEL A. RAMOS
San Bernardino County District Attorney
Board Member
JULIE NAUMAN
Executive Officer

Michael J Booth G27872
PO Box 3535
Norco, CA  92860

December 24, 2009

RE:  Claim G585483 for Michael J Booth, G27872

Dear Michael Booth,

The Victim Compensation and Government Claims Board rejected your claim at its hearing on
December 17, 2009.

If you have questions about this matter, please mention letter reference 123 and claim number G585483 when
you call or write your claim technician or analyst at (800) 955-0045.

Sincerely,

Jacqueline B. Tinetti,  Program Manager
Government Claims Program
Victim Compensation and Government Claims Board

cc:  Corrections and Rehabilitation

Warning
Subject to certain exceptions, you have only six months from the date this notice was personally delivered or
deposited in the mail to file a court action on this claim.   See Government Code Section 945.6.  You may seek
the advice of an attorney of your choice in connection with this matter.  If you desire to consult an attorney, you
should do so immediately.

* * * * * * * * *

It is not necessary or proper to include the Victims Compensation and Government Claims Board (Board) in
your court action unless the Board was identified as a defendant in your original claim.  Please consult
Government Code section 955.4 regarding proper service of the summons.

Ltr 123 Claim Rejection

*Exhibit D*

Case 3:10-cv-01236-WQH-NLS   Document 1-1   Filed 06/07/10   Page 24 of 61

[10]     Christie, Chief Justice, Moore and Walsh, Justices.

[11]     The opinion of the court was delivered by: Walsh

[12]     WALSH, Justice:

[13]     This is an appeal from a Superior Court jury verdict awarding $530,000 compensatory and $250,000 punitive damages to an employee of a tenant in a shopping mall who was abducted and raped while leaving her employment. The jury concluded that the plaintiff's injuries were attributable to the combined neglect of the owner of the mall, Jardel Co., Inc., and its parent corporation, John A. Robbins Co., in not providing adequate security in the mall parking lot. Jardel and Robbins *fn1 contend that the trial court erred in not directing a verdict in their favor on the issue of liability and in several evidentiary rulings in the course of the trial. Jardel also attacks the jury's award of punitive damages as lacking a sufficient legal predicate. We conclude that while the award of compensatory damages is fully supportable in this case, the Superior Court erred, as a matter of law, in submitting the issue of punitive damages to the jury. Accordingly, we reverse that portion of the Superior Court judgment.

[14]     I

[15]     The incident which gave rise to this litigation occurred on July 18, 1980, shortly after 9:00 p.m. The plaintiff, an employee of the Woolco store in the Blue Hen Mall in Dover, left her place of employment at closing time. She proceeded through the interior arcade of the mall with the intention of exiting through the rear entrance of the mall adjacent to the parking lot where her vehicle was located. Near the entrance to the Fox theater, the plaintiff was accosted by two unkempt young men, later identified as Mark Reed and Harry Turner, who had been denied entrance to the theater because Fox personnel believed them intoxicated. When these individuals asked plaintiff for a cigarette, she briefly spoke with them, gave them a cigarette and walked on. Reed and Turner followed the plaintiff to her car, which was parked approximately 50 feet from the mall entrance. When she attempted to enter her car, they forced their way into the vehicle with her and drove away.

[16]     After being driven to a remote site adjacent to the mall, the plaintiff was beaten and raped by both assailants. While she was unconscious and lying on the ground, her assailants attempted to run her over with her car and later set fire to the car while she was lying in it. Plaintiff regained consciousness and staggered nude and bloodied onto a nearby highway where a passing motorist found her and took her to a nearby hospital.

[17]     Plaintiff remained hospitalized for six days. She was treated for severe contusions to the face and scalp, a cerebral concussion and a permanent fracture of the left infra-orbital rim

*Page 1 of 4 (Exhibit E)*

"wanton," which has statutory roots now largely extinct. However, the sharp distinction, drawn by this Court in McHugh v. Brown, Del. Supr., 50 Del. 154, 125 A.2d 583, 585 (1956), is still apt. Wantonness is no more a form or degree of negligence than is wilfulness. *fn8 Willfulness and wantonness involve an awareness, either actual or constructive, of one's conduct and a realization of its probable consequences, while negligence lacks any intent, actual or constructive. Id.

[65]    The same distinction between reckless and negligent conduct exists under Delaware's Criminal Code. Criminal negligence is defined in 11 Del.C. § 231(d) as negligence, albeit in a gross form, while reckless conduct as defined in 11 Del.C. § 231(c) connotes a distinctly different state of mind. Kile v. State, Del. Supr., 382 A.2d 243, 245 (1978). A reckless state of mind, with its conscious disregard of substantial risks, will support a charge of manslaughter, while criminal negligence, with its lack of perception, however gross, will justify only a charge of criminally negligent homicide. 11 Del.C. §§ 631, 632.

[66]    Criminal negligence as defined in 11 Del.C. § 231(d) is the functional equivalent of gross negligence as that term is applied as a basis for the recovery of damages for civil wrongs. Gross negligence, though criticized as a nebulous concept, signifies more than ordinary inadvertence or inattention. It is nevertheless a degree of negligence, while recklessness connotes a different type of conduct akin to the intentional infliction of harm. Stevenson, Negligence In The Atlantic States, §§ 11-16 (1954) & Supp. (1975). In Delaware tort law the term "gross negligence" has little significance. Simple negligence suffices for recovery of compensatory damages, and where reckless (wanton) or wilful conduct is required, either as a threshold for recovery, as in claims based on the premises guest statute or as a prerequisite for the recovery of punitive damages, as in this case, even gross negligence will not suffice. *fn9 The concept of gross negligence continues to find application as a recovery threshold in cases of corporate director liability under the business judgment rule. Aronson v. Lewis, Del. Supr., 473 A.2d 805 (1984); Smith v. Van Gorkom, Del.Supr., 488 A.2d 858, 873 (1985), and as an exception to the immunity enjoyed by public officers and employees under the State Tort Claims Act, 10 Del.C. § 4001 et. seq. Beck v. Claymont School District, Del.Super., 407 A.2d 226, 231 (1979), aff'd, 424 A.2d 662 (1980).

[67]    There is no contention here that Jardel's conduct was intentional or malicious. Its actions must therefore be tested under the standard of recklessness, i.e., a conscious indifference to the rights of others. When so measured it is clear that the evidence did not suffice for submission to the jury of the issue of punitive damages.

[68]    Two significant elements must be present for recklessness to exist. The first is the act itself, e.g. in accident cases the negligent operation of a motor vehicle or aircraft, in a products liability claim the manufacture or distribution of a defective product or, as in this case, the decision to provide limited security in areas to which the public has been invited. The second, crucial element involves the actor's state of mind and the issue of foreseeability, or the perception the actor had or should have had of the risk of harm which his conduct would create. The actor's state of mind is thus vital. Feld v. Merriam,

*Page 2 of 4*

[82] Jardel did not present to the trial court its objection to the allowance of these costs until it filed its motion for reargument of the trial court's granting of the plaintiff's application. Thus, Jardel's objection to the assessment of specific items of costs appears untimely. Indeed, the trial court's ruling of May 16, 1985, rejecting Jardel's constitutional argument, concludes with the language: "There being no other objections to the plaintiff's bill of costs, the bill is granted."

[83] Even if Jardel's objection to specific allowances is timely it clearly lacks merit. The decision awarding costs is a matter within the sound discretion of the trial court and we find no abuse of discretion in this case.

[84] In sum, we AFFIRM the judgment of the Superior Court in all respects with regard to the award of compensatory damages against both Jardel and Robbins. We are of the view, however, that, as a matter of law, plaintiff failed to present evidence sufficient to establish a basis for the award of punitive damages. Accordingly, that portion of the judgment awarding punitive damages is REVERSED.

---

Opinion Footnotes

---

[85] *fn1 Although there was a determination of joint liability based on Robbins' role in approving Jardel's security plan, a finding sharply contested by the appellants, Jardel as the owner and manager of the mall had primary responsibility for security. Unless the context otherwise requires a distinction between the two, the defendants will be referred to jointly as "Jardel."

[86] *fn2 Globe had been joined as a defendant in the Superior Court action but was absolved of liability by the jury's verdict.

[87] *fn3 As the Superior Court noted in denying Jardel's motion for a directed verdict, if the Code defined the landlord's duty in this case, the plaintiff would be denied recovery simply because she was an employee of a tenant, while a mere patron who was assaulted under identical circumstances could assert the usual common law claim for negligence based on the same claim of inadequate security.

[88] *fn4 D.R.E. 403 provides:

[89] RULE 403. EXCLUSION OF RELEVANT EVIDENCE ON GROUNDS OF PREJUDICE, CONFUSION OR WASTE OF TIME.

Page 3 of 4

« up

Q One that I've had is I'm in this building getting chased by a green monster that I cannot outrun.

A Did you ever have that dream before?

A No, I have not.

Q Did you ever have any problems sleeping before?

A No, I did not.

Q Do you still have those dreams?

A Yes, I do.

Q Since you filed your lawsuit have any inmates made advances on you?

A Yes, they have.

Q What kind of advances?

A I've been asked to moon inmates. I've been asked to participate sexually with inmates. I've--that's basically it.

Q Have you done that?

A No, I have not.

Q Have you received any counseling up there at the penitentiary to help you with any of these problems?

A No, I have not. I put in requests to a psychologist, thirty or forty of them at least, and he has seen me once.

Q Did you consent to any of those sexual contacts with those other inmates?

A No, I did not.

Transcript at 145-46.    *This is to show a relevant president*

---

[6] See, e.g., Jardel Co. v. Hughes, 523 A.2d 518 (Del.1987) ($530,000 jury award to rape victim sustained on appeal); Gordon v. Chicago Transit Auth., 470 N.E.2d 1163, 83 Ill.Dec. 743, 128 Ill.App.3d 493 (Ill.App.Ct.1984) ($200,000 jury award to assault and rape victim sustained on appeal); Virginia D. v. Madesco Inv. Corp., 648 S.W.2d 881 (Mo.1983) (en banc) (trial court entered judgment for defendant notwithstanding the verdict; on appeal, Supreme Court of Missouri reversed and reinstated $100,000 jury award to assault and molestation victim)

---

[1] While failure to object to a jury instruction is normally fatal, see Fed.R.Civ.P. 51, we retain the discretion to review error not preserved for appeal if that error is so prejudicial as to have "seriously affected the fairness, integrity or public reputation of judicial proceedings." Rowe International, Inc., v. J.B. Enterprises, Inc., 647 F.2d 830, 835 (8th Cir.1981) (citation omitted). In Ratliff v. Wellington Exempted Village Schools Board of Education, 820 F.2d 792, 796-98 (6th Cir.1987), a case very near to the one before us, the court applied Stachura retroactively to nullify a damage award in a section 1983 action because the jury was instructed, without objection, to consider the intrinsic value of the plaintiff's constitutional rights. The Ratliff court's discussion of the interplay between the plain error rule, Fed.R.Civ.P. 51, and the Supreme Court's "retroactive application" doctrine, Bradley v. School Board of the City of Richmond, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974), illuminates the reasons for retroactive application of the Stachura rule where no objection to a jury instruction has been made at trial



CC0 | TRANSFORMED BY PUBLIC.RESOURCE.ORG

« up

845 F.2d 763

### Willard Ralph VOSBURG, Appellee,
v.
### Herman SOLEM and Richard Rist, Appellants.

*Nos. 87-5032, 87-5033.*

**United States Court of Appeals,
Eighth Circuit.**

*Submitted Aug. 31, 1987.
Decided April 27, 1988.
Opinion on Denial of Rehearing June 16, 1988.
Rehearing and Rehearing En Banc Denied Sept. 22, 1988.*

John W. Bastian, Pierre, S.D., for appellants.

Michael J. Schaffer, Sioux Falls, S.D., for appellee.

Before LAY, Chief Judge, MAGILL, Circuit Judge, and LARSON, Senior District Judge.[*]

LAY, Chief Judge.

---

1    Willard Vosburg brought this 42 U.S.C. Sec. 1983 (1982) action, seeking monetary and injunctive relief. Vosburg claims that Herman Solem, Warden of the South Dakota State Penitentiary, and Richard D. Rist, Associate Warden, violated his right to be free from cruel and unusual punishment. Following a five-day trial, the jury returned a verdict awarding Vosburg $10,000 on his section 1983 claim. We affirm the judgment on the verdict, award attorney's fees and post-verdict interest, and we remand the case to the district court with directions to dismiss the prayer for injunctive relief as moot.

Background

2    Vosburg entered the South Dakota State Penitentiary on December 16, 1982, to begin serving his sentence for possession of a stolen motor vehicle. It was his first time in prison. At the time, Vosburg was nineteen years old. He weighed approximately 135 pounds.

3    Two days after Vosburg entered the penitentiary, Edward Abbenhaus was brought to the penitentiary to serve out his sentence. Abbenhaus had killed his mother by strangling her. Vosburg and Abbenhaus met in the "intake area" of the penitentiary. Abbenhaus soon asked Vosburg to share a cell ("double cell") with him. At that time, the penitentiary did not have a policy of segregating inmates in the intake area based upon the nature of their crime, criminal record, or psychological profile. With the prison officials' approval, Vosburg was placed in a cell with Abbenhaus.

4    Four days after Vosburg and Abbenhaus began double celling, Abbenhaus assaulted Vosburg. Abbenhaus shoved a piece of cloth into Vosburg's mouth and raped him. Word of Vosburg's rape spread throughout the prison. Vosburg was

*Page 1 of 2 (Exhibit F)*

« up    exually assaulted again on three separate occasions by three other inmates.

5    After his release in February of 1984, Vosburg brought this section 1983 action. Following the return of the jury's verdict, the district court[1] took Vosburg's requests for injunctive relief under advisement. After several months' consideration, the district court granted Vosburg partial injunctive relief, requiring defendants to report to county and state law enforcement officials all cases in which the prison authorities had reasonable cause to believe that a rape had occurred in the penitentiary. The district court, however, denied Vosburg's request for an injunction prohibiting double celling inmates in the intake and protective custody areas of the penitentiary. The district court also denied defendants' motions for judgment notwithstanding the verdict and a new trial, and awarded Vosburg attorney's fees and costs under 42 U.S.C. Sec. 1988.

Liability

6    The prison officials urge this court to reverse the district court's denial of their motion for a judgment n.o.v. on the ground that Vosburg failed to prove that they acted with reckless disregard of his right to protection from attacks of other inmates.[2] The district court submitted the issue of liability to the jury under the following instruction:

7    Prison officials may be liable for a violation of a prisoner's civil rights where they are deliberately indifferent to a prisoner's constitutional right to be free from sexual attacks by other inmates, if they actually intend to deprive him of that right, or if they act with reckless disregard of this right.

8    Reckless disregard of a prisoner's right to be free from sexual attacks by other inmates may be shown by the existence of a pervasive risk of harm to inmates from other prisoners and a failure by prison officials to reasonably respond to that risk.

9    A pervasive risk of harm may not ordinarily be shown by pointing to a single incident or to isolated incidents, but it may be established by much less than proof of a reign of violence and terror in the particular institution. It is enough that violence and sexual assaults occur with sufficient frequency that prisoners are put in reasonable fear for their safety and to reasonably apprise prison officials of the existence of the problem and the need for protective measures.

10    It is not necessary to show that all prisoners suffer a pervasive risk of harm. It is enough that an identifiable group of prisoners do, if the complainant is a member of that group.

11    There is no challenge to this instruction. It clearly reflects the applicable law. See Martin v. White, 742 F.2d 469, 474 (8th Cir.1984); Wade v. Haynes, 663 F.2d 778 (8th Cir.1981), aff'd, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). Solem and Risk argue that Vosburg failed to prove that the risk of violence and sexual assault was substantial enough to put them on notice of the danger Vosburg faced. The defendants also maintain that prison policies, such as orientation for new inmates, availability of protective custody, and training of prison personnel, were adequate to address the existing level of violence at the penitentiary. We are satisfied, however, that sufficient evidence supports the jury's finding of liability.

12    The evidence contains specific and detailed accounts of the four separate instances in which Vosburg was sexually assaulted. Other young inmates also gave

STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS AND REHABILITATION
INMATE APPEALS BRANCH
P. O. BOX 942883
SACRAMENTO, CA  94283-0001

# DIRECTOR'S LEVEL APPEAL DECISION

Date:     APR 1 2 2010

In re:   Michael Booth, G27872
California Rehabilitation Center
P.O. Box 1841
Norco, CA  92860-0991

IAB Case No.: 0909395          Local Log No.: RJD-09-00995

This matter was reviewed on behalf of the Director of the California Department of Corrections and Rehabilitation (CDCR) by Appeals Examiner S. Wright, Facility Captain. All submitted documentation and supporting arguments of the parties have been considered.

**I    APPELLANT'S ARGUMENT:** It is the appellant's position that Correctional Officer (CO) T. Armstead and R. Bolding were negligent in their duties in the Administrative Segregation Unit (ASU) Housing Unit "8." The appellant claims he told CO Armstead and Bolding that his cellmate had raped him on several occasions. The appellant further claims that after telling them he was raped, they failed to move him out of the cell. The appellant alleges on June 29, 2009, he went to his ASU Placement hearing, and was placed on double cell status. Later that day, a CO asked if he wanted to move to Facility "2," Housing Unit "8" cell 128 with inmate Shoemake, C. C78635. The appellant stated he did not, but was told he would receive a CDC Form 115, Rules Violation Report for refusing a cellmate if he did not. On June 25, 2009 at about 2000 hours, he was raped by Inmate Shoemake. At 2400 hours, he informed CO Silva that he needed out of his cell. The CO said okay, walked away and never came back. The appellant was able to get a hold of the second watch sergeant, and told him he needed to get out of his cell. The Sergeant said okay, walked away, and never came back. That night, the appellant was raped again. The appellant claims he informed CO Armstead, who contacted CO Bolding. CO Bolding came to his cell and told him that he would be moved; however, he was left in the cell, and that night he was raped again. The appellant was contacted again on June 27, 2009, and offered three possible cell mates, but were refused. That night, he was raped again. On June 28, 2009, he saw a Psychiatric Technician and asked to be seen, but after she left, Inmate Shoemake put a weapon to his neck and made him call her and tell her he did not need to be seen. That night he was raped again. On June 29, 2009, Inmate Shoemake left the cell and he started yelling for anyone who would listen, and CO Hernandez responded and saved him. The appellant requests to be transferred from the staff that enabled his prolonged torture, that Inmate Shoemake to be charged with rape, that he receive financial compensation, that written reprimands be given to the aforementioned staff, and a keep away order for COs Silva, Armstead, and the Second Watch Sergeant at Building "8" be given.

**II    SECOND LEVEL'S DECISION:** The reviewer found the appellant was interviewed August 12, 2009, by Correctional Lieutenant A. Pittman. A review of the allegations of staff misconduct presented in the written complaint has been completed. Based upon this review, the appellant's appeal has been processed as a Staff Complaint Appeal Inquiry. The following witnesses were questioned: COs N. Scharr, R. Bolding and Inmate Shoemake. The following information was reviewed as a result of the appellant's allegations of staff misconduct: The appellant's appeal, and attachments. The appeal was granted in part at the Second Level of Review (SLR), in that an appeal inquiry was conducted and staff did not violate policy and procedure in this matter.

**III   DIRECTOR'S LEVEL DECISION:** Appeal is denied.

   **A.   FINDINGS:** Upon review of the documentation submitted, it is determined that the appellant's allegations have been reviewed and evaluated by the administrative staff and an appeal inquiry has been completed at the SLR.

   In event that staff misconduct was substantiated, the institution would take the appropriate course of action. All staff personnel matters are confidential in nature and not privy to the inquiries of other staff, the general public or the inmate population, and would not be released to the appellant. However, upon

MICHAEL BOOTH, G27872
CASE NO. 0909395
PAGE 2

completion of final review, or culmination of an appeal inquiry, the appellant is to be notified by the respective staff that an inquiry has been completed.  On February 17, 2010, the examiner reviewed the related confidential appeal inquiry report and verified that developed information supports the reviewer's conclusion.  Although the appellant has the right to submit an appeal as a staff complaint, the request for administrative action regarding staff or the placement of documentation in a staff member's personnel file is beyond the scope of the appeals process.  Relief at the Director's Level of Review is not warranted.

**B.   BASIS FOR THE DECISION:**
California Penal Code Section: 832.5, 832.7, 832.8
California Code of Regulations, Title 15, Section: 3001, 3004, 3005, 3084.1, 3380

**C.   ORDER:**  No changes or modifications are required by the Institution.

This decision exhausts the administrative remedy available to the appellant within CDCR.  If dissatisfied, the appellant may forward this issue to the California Victims Compensation and Government Claims Board, (formerly known as the State Board of Control), Government Claims Unit, P.O. Box 3034, Sacramento, CA 95812-3035, for further review.


S. WRIGHT, Appeals Examiner
Inmate Appeals Branch

for   D. FOSTON, Chief
Inmate Appeals Branch

cc:     Warden, CRC
        Appeals Coordinator, CRC
        Appeals Coordinator, RJD

**RECEIVED** JUL 17 2009

**RECEIVED** JUL 17 2009

OCT 05 2009

**INMATE/PAROLEE**
**APPEAL FORM**
CDC 602 (12/87)

Location: Institution/Parole Region
1. RJD
2. _____

Log No.
1. 09-995
2. _____

Category
CCC
Other

You may appeal any policy, action or decision which has a significant adverse affect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

| NAME | NUMBER | ASSIGNMENT | UNIT/ROOM NUMBER |
|------|--------|------------|------------------|
| Booth | G27872 | —— | F2-8-222L |

A. Describe Problem: On Jan. of 09 inmate Shomake was placed in adseg for beating up a homosexul for refusing to be his cellie. On 6-16-09 I/m shomake was in an "incell" fight (another battery on an inmate) he was placed on single cell status. On 6-21-09 I was placed in adseg due to safty concerns, i am a lvl 2 I/m he is a lvl 4 I/m. On 6-22-09 i went to my 114D hearing and was placed on double cell status. Later that day an office asked me if i wanted to move in cell 128 w/shomake. i asked

If you need more space, attach one additional sheet.          See Atatched Sheet

B. Action Requested: See Atatched Sheet

Inmate/Parolee Signature: Mike Booth          Date Submitted: 6-30-09

C. INFORMAL LEVEL (Date Received: _____ )

Staff Response: _____

**BYPASS**

Staff Signature: _____          Date Returned to Inmate: _____

D. FORMAL LEVEL
If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128, etc.) and submit to the Institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response.

**BYPASS**

_____
Signature: _____          Date Submitted: _____
Note: Property/Funds appeals must be accompanied by a completed
Board of Control form BC-1E, Inmate Claim

INMATE APPEALS BRANCH

**RECEIVED** NOV -9 2009

INMATE APPEALS BRANCH

**RECEIVED** JAN -6 2010

858

**RECEIVED**

SEP 24 2009

CDC Appeal Number: 09-995

CRC APPEALS OFFICE

G27872

0909395

**E. REVIEWER'S ACTION** (Complete within 15 working days): Date assigned: JUL 2 7 2009   Due Date: AUG 2 8 2009

☐ Granted   ☐ P. Granted   ☐ Denied   ☐ Other

Interviewed by: *See attached*

Staff Signature: ___   Title: LT   Date Completed: 9-14-09

Division Head Approved: ___   Title: ___   Returned: Date to Inmate: SEP 10 2009

**F.** If dissatisfied, explain reasons for requesting a Second-Level Review, and submit to Institution or Parole Region Appeals Coordinator within 15 days of receipt of response.

This response said nothing of the Sgt whom I spoke of. This is the person who was able to prevent the bulk of the assaults. This Officer was the one most responsible for the continuous pain & suffering.

Signature: Michael Beaty   Date Submitted: 9-23-09

**G. REVIEWER'S ACTION** (Complete within 10 working days): Date assigned: OCT 05 2009   Due Date: NOV 0 2 2009

☐ Granted   ☒ P. Granted   ☐ Denied   ☐ Other

☑ See Attached Letter

Signature: ___ SSA   Date Completed: 10/16/9

Warden/Superintendent Signature: ___   Date Returned to Inmate: OCT 2 0 2009

**H.** If dissatisfied, add data or reasons for requesting a Director's Level Review, and submit by mail to the third level within 15 days of receipt of response.

First, I was not offered new cellie's. I offer them to move in with these New cellie's. I was denied due to possible violence. Second, There is no mention of the fact that I/M Shoemake was on single cell status towards his last cellie on openly gay man. Third, This is still no interview w/ any Sergeants.

Signature: Michael Beaty   Date Submitted: 11-3-09

For the Director's Review, submit all documents to: Director of Corrections
P.O. Box 942883
Sacramento, CA 94283-0001
Attn: Chief, Inmate Appeals

**DIRECTOR'S ACTION:** ☐ Granted   ☐ P. Granted   ☒ Denied   ☐ Other

☐ See Attached Letter

Date: APR 1 2 2010

CDC 602 (12/87)

Q2-995

was he whit us too. but yes i said i only dont
want to. i was told if i did not that i would recieve
a 115 for refusing a cellie. So i said OK. i would
move with whoever. On 6-25-09 at about 10pm i was
Raped by i/m shoemake. At 1200pm i informed CO Silva
That i needed out of this cell. He said OK then
walked away. Never to come back. So i was able to
get ahold of the 2Nd watch sargnt for Building
8. on 6-25-09. I told him that i needed out of
the cell. He said OK and walked away never
to come back. That night i was raped agian. On
6-26-09 i told co Armstead i needed out of holding
the cell. he said ok and contacted CO Bolding
Who came to the cell and said ok & he would move
me. but left me in the cell. That night i was
Raped agian. Agian Bolding on 6-27-09 told me
i couldnt move unless i founed a cellie. So
i gave him 3 i/m's names Locus, Collins, Hawthorn.
i was told no to all 3 cellies. That night i was
raped agian. 6-28-09 i saw psych tech Rodrigues
and said i need to see the psych. She
said OK and walked away. Shoemake put a shank
to my neck and made me call her back and
tell her i didnt need to see the psych.
She said OK and walked away. That night i was
raped agian. ON 6-29- they took shoemake to the
clinich. I stated yelling for any cop that wald
listen. Co Hernandez heard me. And saved me.

The Officers correct spelling of his
name is BOlDING      Page 4 of 14

Action Requested

①. To be transferd from the C.O's that enabled my prolonged Torture

② for i/m Shoemake to be charged with Rape & be Moved from the building i am being housed in.

③ financial Compensation

④ verbal as well as written repermands placed on each officer named in this 602. i also want each officer to be sent to speacial ~~being~~ training. i also want any progressive punnishment that is called for any ot said officers.

⑤ a keep away order for CO's Silva, Armstead and that 2nd watch Sargent at Building 8 on 6-25-09

STATE OF CALIFORNIA
RIGHTS AND RESPONSIBILITY STATEMENT
CDCR 1858 (Rev. 10/06)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

# RIGHTS AND RESPONSIBILITY STATEMENT

*The California Department of Corrections and Rehabilitation has added departmental language (shown inside brackets, in non-boldface type) for clarification purposes.*

**Pursuant to Penal Code 148.6, anyone wishing to file an allegation of misconduct by a departmental peace officer must read, sign and submit the following statement:**

**YOU HAVE THE RIGHT TO MAKE A COMPLAINT AGAINST A POLICE OFFICER** [this includes a departmental peace officer] **FOR ANY IMPROPER POLICE** [or peace] **OFFICER CONDUCT. CALIFORNIA LAW REQUIRES THIS AGENCY TO HAVE A PROCEDURE TO INVESTIGATE CITIZENS'** [or inmates'/parolees'] **COMPLAINTS. YOU HAVE A RIGHT TO A WRITTEN DESCRIPTION OF THIS PROCEDURE. THIS AGENCY MAY FIND AFTER INVESTIGATION THAT THERE IS NOT ENOUGH EVIDENCE TO WARRANT ACTION ON YOUR COMPLAINT; EVEN IF THAT IS THE CASE, YOU HAVE THE RIGHT TO MAKE THE COMPLAINT AND HAVE IT INVESTIGATED IF YOU BELIEVE AN OFFICER BEHAVED IMPROPERLY. CITIZEN** [or inmate/parolee] **COMPLAINTS AND ANY REPORTS OR FINDINGS RELATING TO COMPLAINTS MUST BE RETAINED BY THIS AGENCY FOR AT LEAST FIVE YEARS.**

| | | |
|---|---|---|
| *Michael J Booth* | *Mchl Bxtt* | *12-28-09* |
| COMPLAINANT'S PRINTED NAME | COMPLAINANT'S SIGNATURE | DATE SIGNED |
| INMATE/PAROLEE PRINTED NAME | INMATE/PAROLEE'S SIGNATURE | CDC NUMBER: G27872 · DATE SIGNED 12-28-09 |
| *Michael J Booth* | *Mchl Bxtt* | |
| RECEIVING STAFF'S PRINTED NAME | RECEIVING STAFF'S SIGNATURE | DATE SIGNED |

DISTRIBUTION:
ORIGINAL -
Public - Institution Head/Parole Administrator
Inmate/Parolee - Attach to CDC form 602
Employee - Institution Head/Parole Administrator
COPY - Complainant

*Page 5 of 14*

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                    ARNOLD SCHWARZENEGGER, GOVERNOR

**INMATE APPEALS BRANCH**
1515 S Street, Sacramento, CA 95814
P.O. Box 942883
Sacramento, CA 94283-0001



December 22, 2009


BOOTH, MICHAEL, G27872
California Rehabilitation Center
P.O. Box 1841
Norco, CA  92860-0991



RE: IAB# 0909395    RJD-09-00995    STAFF COMPLAINTS

Mr. BOOTH:

The Inmate Appeals Branch, California Department of Corrections and Rehabilitation (CDCR) acts for the Director, Division of Adult Institutions, at the third level of appeal as established in California Code of Regulations (CCR) Title 15, Article 8.  The Branch examines and responds to inmate and parolee appeals, after the institution or parole region has responded at the Second Level of Appeal.

Your Counselor, Parole Agent, or Appeals Coordinator can answer any questions you may have regarding the appeals process and/or assist in obtaining any requested documents. The inmate library offers resources to obtain general information regarding regulations, procedures, policies, and government agency addresses. The Inmate Appeals Branch appreciates your responsible use of the appeal system to address your grievance.

The Inmate Appeals Branch has received an appeal from you which has been rejected for the following reason(s): Please include the following supporting documentation:

- CDCR Form 1858, Rights and Responsibilities Statement


*N. Grannis (signature)*

N. GRANNIS, Chief
Inmate Appeals Branch


NOTE:  Please make the changes or corrections requested and submit the original appeal within fifteen working
        days.  Once an appeal has been cancelled that appeal may not be resubmitted.  However a separate
        appeal can be filed on the cancellation decision.  The original appeal may only be resubmitted if the appeal
        on the cancellation is granted.

****PERMANENT APPEAL ATTACHMENT - DO NOT REMOVE****

*Page 6 of 14*

State of California                                                      ATTACHMENT E-3

# Memorandum

Date   :   October 16, 2009

To     :   Booth, M.
           G-27872
           California Rehabilitation Center

Subject:   **STAFF COMPLAINT RESPONSE - APPEAL # 09-995**

**APPEAL ISSUE:**  The appellant alleges the following:  On June 22, 2009, he went to his Administrative Segregation Unit Placement hearing and was placed on double cell status. Later that day, a Correctional Officer (C/O) asked him if he wanted to move to Facility 2, Housing Unit 8, Cell 128, with inmate (I/M) Shoemake, C-78635.  He said that he did not, but was told he would receive a Rules Violation Report for refusing a cell mate if he did not.  On June 25th, at about 10:00 pm, he was raped by I/M Shoemake. AT 12:00pm he informed C/O Silva that he needed out of his cell.  The C/O said OK, walked away and never came back.  He was able to get a hold of the 2nd Watch Sergeant, who he told that he needed to get out of his cell, but the Sgt. Said OK, walked away and never came back. That night, he was raped again.  He informed C/O Armstead, who contacted C/O Bolding. C/O Bolding came to his cell and told him that he would be moved; however he was left in the cell and that night, he was raped again.  He was contacted again on June 27th and offered three possible cell mate but they all refused.  That night, he was raped again.  On June 28th, he saw a Psychiatric Technician and asked to be seen, but after she left, I/M Shoemake put a weapon to his neck and made him call her back and tell her he didn't need to be seen.  That night he was raped again. On June 29th, I/M Shoemake left the cell and he started yelling for anyone who would listen.  C/O Hernandez responded and saved him.

The appellant's requested remedy is to be transferred from the C/Os that enabled his prolonged torture; for I/M Shoemake to be charged with rape; financial compensation; written reprimands for the C/Os, and a keep away order for C/Os Silva, Armstead and the 2nd Watch Sergeant at Building 8 on June 25, 2009.

**DETERMINATION OF ISSUE:** A review of the allegations of staff misconduct presented in the written complaint has been completed. Based upon this review your appeal has been handled as follows:

☒  PROCESSED AS A STAFF COMPLAINT APPEAL INQUIRY

**SUMMARY FOR APPEAL INQUIRY:**
The appellant was interviewed on August 12, 2009, by A. Pittman, Correctional Lieutenant, and he reiterated his complaint.

☒ A Confidential Inquiry has been conducted.  The following information was reviewed as a result of your allegations of staff misconduct: Appeal Log# 09-995 and supporting documents.  The following witnesses were questioned: C/O N. Scharr; C/O R. Bolding; Shoemake, C-78635.

*Page 7 of 14*

Booth, M., G-27872
Appeal Log# 09-995
Page 2

**FINDINGS FOR AN APPEAL INQUIRY:**

Your appeal is PARTIALLY GRANTED at the ☐ First level ☒ Second level:

☒ An inquiry into your allegation has been conducted.

ALL STAFF PERSONNEL MATTERS ARE CONFIDENTIAL IN NATURE. As such, the details of any inquiry will not be shared with staff, members of the public, or inmates. Although you have the right to submit a staff complaint, a request for administrative action regarding staff or the placement of documentation in a staff member's personnel file is beyond the scope of the staff complaint process. However, you have the right to be notified if after a review of your allegations, it is determined that staff violated CDCR policy. In this case:

☒ The inquiry is complete. Staff did not violate CDCR policy.

Allegations of staff misconduct do not limit or restrict the availability of further relief via the inmate appeals process. If you wish to appeal the decision, you must submit your staff complaint appeal through all levels of appeal review up to, and including, the Director's Level of Review. Once a decision has been rendered at the Director's Level of Review, your administrative remedies will be considered exhausted.


D. R. MORRIS
Chief Deputy Warden
Richard J. Donovan Correctional Facility

405-18 Cov

## INMATE APPEAL ASSIGNMENT NOTICE

To: INMATE BOOTH, G27872                                     Date: October 5, 2009
Current Housing: CRC

From: INMATE APPEALS OFFICE

Re: APPEAL LOG NUMBER: RJD-2-09-00995

ASSIGNED STAFF REVIEWER: APPEALS
APPEAL ISSUE: STAFF COMPLAINTS
DUE DATE: 11/02/2009

Inmate BOOTH, this acts as a notice to you that your appeal has been sent to the above
staff for SECOND level response.  If you have any questions, contact the above staff
member. If dissatisfied, you have 15 days from the receipt of the response to forward
your appeal for THIRD level review.  Third level appeals are to be mailed directly to:

        Chief of Inmate Appeals
        Department of Corrections
        P. O. Box 942883
        Sacramento, CA  94283-0001


E. FRANKLIN
Inmate Appeals Coordinator
Richard J. Donovan Correctional Facility

State of California
CDC FORM 695
Screening For:
CDC 602 Inmate/Parolee Appeals
CDC 1824 Reasonable Modification or Accommodation Request

RE: Screening at the SECOND Level

September 24, 2009

*BOOTH, G27872*
*4 0500000000018L*

Log Number: CRC-I-
(Note: Log numbers are not assigned to screen out appeals, or informal level appeals)

The enclosed documents are being returned to you for the following reasons:

*Submit appeal directly to RJD*
*Address:*

> **APPEALS COORDINATOR**
> **RICHARD J. DONOVAN CORRECTIONAL**
> **FACILITY**
> **480 ALTA RD.**
> **SAN DIEGO, CA   92179**

Appeals Coordinator
California Rehabilitation Center

NOTE: Please make the changes or corrections requested and resubmit the original appeal within fifteen working days. Once an appeal has been cancelled that appeal may not be resubmitted. However a separate appeal can be filed on the cancellation decision. The original appeal may only be resubmitted if the appeal on the cancellation decision is granted.

---

**PERMANENT APPEAL ATTACHMENT – DO NOT REMOVE**

*Page 10 of 14*

## INMATE APPEAL ASSIGNMENT NOTICE

To: INMATE BOOTH, G27872                      Date: September 11, 2009
Current Housing: 4 0500000000039U

From: INMATE APPEALS OFFICE

Re: APPEAL LOG NUMBER: CRC-4-09-00682

ASSIGNED STAFF REVIEWER: CCII LAKIN
APPEAL ISSUE: LIVING CONDITIONS
DUE DATE: 09/18/2009          *Processed as emergency.*

Inmate BOOTH, this acts as a notice to you that your appeal has been sent to the above
staff for SECOND level response.  If you have any questions, contact the above staff
member. If dissatisfied, you have 15 days from the receipt of the response to forward
your appeal for THIRD level review.  Third level appeals are to be mailed directly to:

          Chief of Inmate Appeals
          Department of Corrections
          P. O. Box 942883
          Sacramento, CA  94283-0001

T. Lakin
CCII
California Rehabilitation Center

*Page 11 of 14*

State of California                    *Now Housed at CRC*                    ATTACHMENT E-3

# Memorandum  *405 18 LOW*

Date    :    9/4/2009

                                            *405-18 LOW*

To      :    Booth, M., # G-27872
             ~~F2-07-249L~~  *CRC*
             Richard J. Donovan Correctional Facility

Subject:    **STAFF COMPLAINT RESPONSE - APPEAL # RJD-2-09-00995**

**APPEAL ISSUE:** You allege that Correctional Officers (C/O's) T. Armstead and R. Bolding were negligent in their duties in Administrative Segregation Unit Housing Unit #8. You claim that you told C/O's Armstead and Bolding that your cellmate had raped you on several occasions. You also claim after telling them you were raped, they failed to move you out of the cell.

**DETERMINATION OF ISSUE:** A review of the allegations of staff misconduct presented in the written complaint has been completed. Based upon this review your appeal has been handled as follows:

☒  PROCESSED AS A STAFF COMPLAINT APPEAL INQUIRY
☐  REFERRED TO THE OFFICE OF INTERNAL AFFAIRS (OIA).

**SUMMARY FOR APPEAL INQUIRY:**
You were interviewed on August 12, 2009, by Correctional Lieutenant A. Pittman and you reiterated the same claims as noted on your appeal form.

**CHOOSE ONE:**

☒ A Confidential Inquiry has been conducted. The following witness was questioned: C/O N. Scharr. The following information was reviewed as a result of your allegations of staff misconduct: Central File, Administrative Segregation Unit/Security Housing Unit Double Cell Review CDC 1882-B Form and your Inmate Segregation Record File.

☐ This matter has been referred to the Office of Internal Affairs for follow-up and a possible investigation. If investigated, upon completion of that investigation you will be notified as to whether the allegations were SUSTAINED, NOT SUSTAINED, UNFOUNDED, EXONERATED or that NO FINDING was possible. In the event that the matter is not investigated, but returned by OIA to the institution or region to conduct a Confidential Inquiry, you will be notified upon the completion of that inquiry as to whether it was determined that staff violated, or did not violate policy.

**FINDINGS FOR AN APPEAL INQUIRY:**
Your appeal is PARTIALLY GRANTED at the ☒ First level ☐ Second level:

☒ An inquiry into your allegation has been conducted.

*Page 12 of 14*

Booth, M., G-27872
Log # RJD-2-09-00995
Page.2

☐ An investigation is being conducted by the Office of Internal Affairs

ALL STAFF PERSONNEL MATTERS ARE CONFIDENTIAL IN NATURE. As such, the details of any inquiry will not be shared with staff, members of the public, or inmates. Although you have the right to submit a staff complaint, a request for administrative action regarding staff or the placement of documentation in a staff member's personnel file is beyond the scope of the staff complaint process. However, you have the right to be notified if after a review of your allegations, it is determined that staff violated CDCR policy. In this case:

☐ The inquiry is not yet complete

☒ The inquiry is complete.  Staff did not violate CDCR policy.


Allegations of staff misconduct do not limit or restrict the availability of further relief via the inmate appeals process. If you wish to appeal the decision, you must submit your staff complaint appeal through all levels of appeal review up to, and including, the Director's Level of Review.  Once a decision has been rendered at the Director's Level of Review, your administrative remedies will be considered exhausted.


_A. L. COTA_        _09/04/09_
A. L. COTA              Date
Associate Warden, Facilities II/IV, Records

Page 13 of 14

**INMATE APPEAL ASSIGNMENT NOTICE**

To: INMATE BOOTH, G27872                                    Date: July 27, 2009
Current Housing:  F20700000000146L

From:  INMATE APPEALS OFFICE

Re: APPEAL LOG NUMBER:  RJD-2-09-00995

ASSIGNED STAFF REVIEWER:  A/W-2/4
APPEAL ISSUE:  STAFF COMPLAINTS
DUE DATE:  08/28/2009

Inmate BOOTH, this acts as a notice to you that your appeal has been sent to the above
staff for FIRST level response.  If you have any questions, contact the above staff
member. If dissatisfied, you have 15 days from the receipt of the response to forward
your appeal for SECOND level review.


G. PEDERSON
Inmate Appeals Coordinator
Richard J. Donovan Correctional Facility

To Whom it May Concern,

My name is Michael J. Booth, CDC # G27872. I am an openly gay man living with H.I.V. I am writing this letter to request legal assistance with a civil rights lawsuit. I am going to be very direct, brief and as forthcoming as possible, so that you can make an informed decision as to my request.

In 1991, Samuel Shoemake was sentenced to seventy-two years in prison for multiple counts of sexual assault. In December of 2008, Shoemake was sent to the administrative-segregation unit of R.J. Donovan Prison (San Diego, CA) for assaulting an openly gay man named "Jaquez". On June 16, 2009 Shoemake assaulted another openly gay man named "Walker" while he was in the hole. Shoemake was then placed on single-cell status, meaning that nobody is supposed to be placed or housed in a cell with him at any time. Nevertheless, I was placed in Samuel Shoemake's cell on June 25, 2009. The reason that I was in the administrative-segregation unit in the first place was that it was supposed to be a safer place for me to be housed; I was not there for any kind of rule violation.

I am a level 2 inmate serving a 3-year, 8-month sentence. Shoemake is a level 4 "lifer" known to be a sexual predator. When I was placed in his cell on June 25th, Shoemake raped me at knife point. I requested help from three correctional officers on the following day (6-26-09). Nobody helped me. I was left in the cell with Shoemake, who raped me again that night and the two following nights as well.

I have filed a grievance with the California Department of Corrections and Rehabilitation, Log #RJD-2-09-00995. This is now at the director of corrections office in Sacramento. Once they return this to me, I will have exhausted all possible institutional remedies. I have also filed a claim with the Victim Compensation & Government Claims Board, claim #G585483. They can be reached at (800) 955-0045 or www.vcgcb.ca.gov

I wrote a letter to the San Diego County District Attorney's Office requesting that charges be filed against Samuel Shoemake. They responded with a letter telling me to contact the San Diego County Sherriff's Office. The person that responded was Jesus Rodriguez (619) 531-4051. I wrote a letter to the Sherriff's Office and have yet to receive a response.

I am preparing a civil rights complaint under 42 U.S.C. section 1983. I have done some research and I have a considerable amount of documentation to support my claims. I believe that I have done a fair job of dealing with a daunting task. However, I am about to enter an area where my reading comprehension will not suffice. I have no formal legal training and I need assistance with my complaint. I want you to know that I have omitted a considerable amount of information to keep this letter as brief as possible. Should you be willing and able to assist me, I would be more than happy to send complete copies of all of my documentation.

If you are unable to assist me in this matter, please take the time to inform me, so that I will at least know where I stand. I also appreciate any referrals to someone who may be able to help. Please see the other side for all relevant contact information.

Thank you for taking the time to read my letter,

signature: _____

Michael J. Booth

date: _____

Page 1 of 13                    Exhibit F

Law Offices
### *Andrew J. Schatkin*
350 Jericho Turnpike
Jericho, New York 11753-
Tel: (516) 932-8120
Fax: (516) 465-7068

Tel: (718) 229-2761
Fax: (718) 279-7247
Cell: (917) 774-7457

E-mail: schatkin@yahoo.com
andrew@schatkin.com
Website: www.schatkin.com

November 27, 2009

Mr. Booth
#G27872
C.R.C. 405-18L
P.O. Box 3535
Norco, CA 92860

Dear Mr. Booth:

I am in receipt of your letter, and have read it with great care and interest.  I must tell you that in order to represent you a fee is involved.  Whatever your decision, I am taking the liberty of enclosing a short professional biography, should you or some other inmate require my services.

Cordially,

Andrew J. Schatkin

*Page 2 of 13*

F 213.382.5403 | Los Angeles, CA 90015-1211
www.lls.edu/community/ccr



# LOYOLA
LAW SCHOOL | LOS ANGELES

THE CENTER FOR
CONFLICT RESOLUTION

Mary B. Culbert, *Director*
Marta S. Gallegos, *Associate Director*
Sara Campos, *Assistant Director*
  *of Case Management*
John S. Rodriguez, *Senior Mediator*
Mary J. Britt, *Senior Conciliator*
Claudia Natera, *Conciliator*
Angie Marin, *Coordinating Secretary*

Bill Hobbs, *Founding Director*

December 3, 2009

Michael Booth, G27872
CRC 405-18 Low
P.O. Box 3535
Norco, CA 92860

> RE:   Referrals
>        File Number:  200915197

Dear Mr. Booth:

Thank you for contacting **The Center For Conflict Resolution.**  You asked if we could refer you to an attorney.  Enclosed is a list of attorneys and/or organizations who we hope will be able to help you.  Please contact them immediately as there may be strict time limitations that may impact your case.  Note that some of the attorneys on this list are in private practice and you must call them to find out about their fees.

I hope that we can help you in the future.  Good luck.

Sincerely,

Marta S. Gallegos
Associate Director

MSG/mjb
Enclosures:  Civil Rights Referrals
             Prisoner Rights Referrals
             Bar Association Referrals

*Page 3 of 13*

# AMY B. VANDEVELD
## ATTORNEY AT LAW

LAW OFFICES OF AMY B. VANDEVELD
1850 Fifth Avenue, Suite 22
San Diego, California 92101
Telephone: (619) 231-8883
Facsimile: (619) 231-8329

December 23, 2009

Mr. Mike Booth
G27872
CRC 40518LOW
P.O. BOX 3535
Norco, CA 92860

Re:   Section 1983 Claim

Dear Mr. Booth:

Thank you for contacting me regarding your Section 1983 claim. I regret to advise you that I will be unable to assist you regarding this matter.  Since I have not had sufficient opportunity to investigate the facts of your case or to research the law applicable to your case, you should not assume that my decision to decline your case is a reflection of the merits of your case.  **Please be advised that I do not now represent you and I will take no action on your behalf.**

Please be further advised that a lawsuit must generally be filed within two years of the date of injury.  In addition, if you have an action against a governmental entity, you may need to file a governmental tort claim with the entity within six months of the incident.

While there may be exceptions to the time requirements, I am not rendering an opinion regarding the applicable deadlines or exceptions to the deadlines, as I have not performed sufficient factual or legal research to give such an opinion.  If you miss these deadlines or fail to exhaust your administrative remedies, however, the court may dismiss your case or claim.  It is therefore very important that you consult with another attorney immediately to ensure that you file your lawsuit or make your claim within the required time frames.

I regret that I am unable to assist you with this particular matter.  The San Diego County Bar Association offers a Free Lawyer Referral & Information Service at (619) 231-8585.

*Page 4 of 13*

Thank you again for contacting me and I wish you success with your case.

Sincerely,

AMY B. VANDEVELD

LAW OFFICES OF
## CHARLES S. ROSEMAN
& ASSOCIATES
———
1761 HOTEL CIRCLE SOUTH, SUITE 250
SAN DIEGO, CALIFORNIA 92108-3318

CHARLES S. ROSEMAN
RICHARD D. PRAGER

January 4, 2010

TELEPHONE (619) 544-1500
FACSIMILE (619) 239-6411

Mr. Michael J. Booth
#G27872
CRC 405 18 Low
P.O. Box 3535
Norco, CA 92860

Re: Your Letter of 11/29/09

Dear Mr. Booth:

Thank you for your letter of November 29, 2009, which I received on 12/23/09.  I truly feel empathetic for the position you are in.

Because of my current office schedule and litigation requirements, I am unable to be of assistance.

I suggest you contact another attorney to assist you with our case.  You might consider contacting Attorney Thomas Lanoe, who is at Casey Gerry Schenk Francavilla Blatt & Penfield, 110 Laurel Street, San Diego, CA 92101, (619)238-1811.

Remember, a claim against a Government entity requires filing within 6 months of the date of the event, giving rise to injury.  Carefully go over all dates with your attorney.  I do not have enough information.

I wish you the best.

Very truly yours,

LAW OFFICES OF CHARLES S. ROSEMAN
& ASSOCIATES

By: _____CHARLES S. ROSEMAN_____
CHARLES S. ROSEMAN, ESQ.

CSR:tlr



**AMERICAN CIVIL LIBERTIES UNION**
**SAN DIEGO & IMPERIAL COUNTIES**

PO Box 87131
San Diego, CA 92138-7131
T/ 619-232-2121 ext. 23
F/ 619-232-0036

March 3, 2010

Mr. Michael J. Booth #G27872
CRC State Prison/405 18 Low
P.O. Box 3535
Norco, CA 92860

Dear Mr. Booth:

This is in response to your request for assistance from the ACLU Foundation of San Diego & Imperial Counties.  We apologize for responding to your request for assistance with a form letter. However, because of the volume of requests we receive, it is necessary for us to use this form.

Based on the information you provided, we have concluded that the ACLU will not be able to assist you in this matter. This decision reflects our own limited resources, and in no way reflects on the worthiness of your case. The ACLU is a non-governmental, non-profit organization that seeks to preserve and extend constitutional rights and principals found mainly in the Bill of Rights. We lack the staff and resources to act as a general legal clinic, however, and are able to accept only a small percentage of the cases we are requested to take.

If you believe you have a potential lawsuit, you should consult with an attorney immediately to ensure that you do not lose the right to bring a legal case due to any applicable time deadlines. You may wish to contact the San Diego County Bar Association at 800-464-1529 for a local attorney referral. You may also wish to contact one of the following attorneys to see if they can be of assistance to you:

| Mike Marrinan | Matthew Miller |
|---|---|
| 614 5th Ave., Ste. D | 835 5th Ave. |
| San Diego, CA 92101-6964 | San Diego, CA 92101-6134 |
| 619-238-6900 | 619-230-8828 |

We're sorry that our response could not be more favorable, and hope that you will be able to resolve this matter satisfactorily.

Thank you,
ACLU of San Diego and Imperial Counties Legal Department

# CaseyGerry

## CASEY GERRY SCHENK FRANCAVILLA BLATT & PENFIELD LLP

110 Laurel Street, San Diego, CA 92101-1419
Tel (619) 238-1811  Fax (619) 544-9232

February 3, 2010

David S. Casey, Jr.
Frederick Schenk
Robert J. Francavilla
Gayle M. Blatt
Thomas D. Penfield
Thomas D. Luneau
Jeremy K. Robinson
Wendy M. Behan
Juan Ordaz
Jessica Klarer Pride
Stephanie S. Baril

*of Counsel*
T. Michael Reed
Scott C. Cummins
Mitchel Olson MD, JD

Richard Westbrook
1944-1982

David S. Casey, Sr.
1913-2003
President,
California State Bar, 1975

Richard F. Gerry
1924-2004
President,
Association of Trial Lawyers
of America, 1982

North County Office
1901 Camino Vida Roble
Suite 121
Carlsbad, CA 92008
(760) 743-8448
Fax (760) 794-9982

Michael Booth, G27872
CRC 405-18L
P.O. Box 3535
Norco, CA 92860

      Re:   Claim for Personal Injuries
           DOI: June 2009

Dear Mr. Booth:

This letter is to follow-up the correspondence sent to you a couple of days ago explaining that our firm would not be able to become involved in your case. Your original communication to us regarding your situation invited us to refer you to other counsel who may be interested in pursuing an action on your behalf. A colleague just got back to me today regarding his interest in your case, and I wanted to let you know that you may be hearing from him in the near future. His name and contact information is:

      Barry D. Mills, Esq.
      3588 Fourth Ave., #210
      San Diego, CA 9 2103
      619-295-5000 telephone
      619-338-4033 facsimile

You may or may not hear from him, but I wanted to inform you of his interest in your case. Mr. Mills indicated that he is doing some research into the legal issues your claim entails. I hope Mr. Mills is able to be of assistance to you.

      Sincerely,

      Linda S. Blair
      Case Manager

*Trial Attorneys Since 1947*
www.cglaw.com

Page 7 of 13



**Center for
Community Solutions**
*Healing and Preventing Sexual Assault
and Relationship Violence*

www.ccssd.org

**Administration Office**
4508 Mission Bay Drive
San Diego, CA 92109
Phone: 858-272-5777
Fax: 858-272-5361

**East County Office**
7339 El Cajon Blvd.
Suite J
La Mesa, CA 91941
Phone: 619-697-7477
Fax: 619-697-5678

**North County Office**
106 South Grape St.
Escondido, CA 92025
Phone: 760-747-6282
Fax: 760-747-163

March 25, 2010

Michael Booth #G27872

C.R.C. 405 18. Low

P.O. Box 3535

Norco, CA   92860

Dear Mr. Booth,

My name is Kristine Vandenberg and I am a sexual assault victim advocate with the Center for Community Solutions in San Diego. I actually got your information last year after you had the SART exam and had set up a meeting with the Investigations Unit to come visit you. Unfortunately they had to cancel my appointment and by the time I was trying to reschedule, you had been transferred to a different prison which meant I had to close your case since I had no way to contact you. When you sent that letter to CALCASA recently, they forwarded it to our agency and it came back to me since I had your case last year.

I wanted to let you know that my job as your advocate is to be there to support you throughout the case and beyond. Everything we talk about is confidential (though given your incarcerated status, that might be a little bit compromised) with the exception of child abuse, elder abuse, suicide, and homicide. I am more than happy to contact people and advocate on your behalf I just need to know what it is that you need help with and I need your permission to make those contacts on your behalf. I know you are looking for legal assistance with a civil rights complaint and I wanted to let you know that I already contacted an attorney who works with our agency a lot. He is interested in your case and said I could give you his information if you want to contact him. I'm not sure if you have phone privileges or if mail is the only way to communicate, but here is all of his contact information:

Steve Allen

Coughlin Stoia Geller Rudman & Robbins LLP

655 West Broadway, Suite 1900

San Diego, CA 92101

(619) 744-4979 direct line

In proceeding from here, it would be helpful for me to know exactly how I can help you. Do you need me to follow up with the DA and/or investigations unit at Donovan? Do you know what ended up happening with the sexual assault criminal case? Other than the legal help for a civil/civil rights case, are there other things you need help with? Are

*Page 8 of ~~NW~~ 13*

you comfortable with me contacting other agencies and organizations to help get you as many resources as possible? Let me know and I will do anything I can to help you.

I also want to let you know that you should be really proud of yourself. It is emotionally and physically painful to experience repeated assaults and it takes a lot of strength to advocate for yourself as strongly as you are, especially given the barriers of incarceration. I look forward to hearing from you.


Sincerely,

Kristine Vandenberg
Center for Community Solutions
7339 El Cajon Blvd., Suite J
La Mesa, Ca 91942
(619) 697-7477 x 35
kvandenberg@ccssd.org



**Lambda Legal**
making the case for equality

04/20/2010

Michael Booth; #G27872
CRC, 405-18 low
P.O. Box 3535
Norco, CA 92860

Dear Michael:

We received your letter dated March 16, 2010.  I have no doubt that you are in a difficult
position, especially as a gay man in the prison system.  Unfortunately, the legal assistance you
seek lies outside the realm of services Lambda Legal provides.  Lambda Legal is a national legal
organization striving to achieve the full civil rights of gay men, lesbians, bisexuals, the
transgendered, and people living with HIV and AIDS.  As such, our limited resources limit
Lambda Legal to take only cases affecting the civil rights of our target populations *and* that set
*new* law or establish a legal precedent.  Therefore, we are unable to offer assistance in your
situation.  I would suggest you contact the following organizations, as they may be in a better
position to assist you.

ACLU – Southern California
1313 W. Eighth St.
Los Angeles, CA 90017

Ms. Melissa Rothstein, Esq.
Just Detention International
3325 Wilshire Blvd., Suite 340
Los Angeles, CA 90010

        I hope these organizations can provide you the assistance you are seeking.  I hope
everything works out for you and I wish you the best.

Regards,

Huong Lam
Lambda Legal Help Desk
Western Regional Office

Page 10 of 13



# INLAND EMPIRE
Latino Lawyers Association, Inc.

2060 University Avenue, Suite 113
Riverside, CA 92507
(951) 369-5846
Fax: (951) 369-6211

April 14, 2010

Michael J. Booth
G27872
CRC, 405-18 Low
P.O. Box 3535
Norco, CA 92860

Dear Mr. Booth,

We received your request for legal assistance via your mailed letter dated April 12, 2010. Unfortunately, we are unable to assist you in your legal dispute. IELLA does not assist with criminal or prison related cases. I wish you luck in seeking assistance in this matter.

Sincerely,

Monica Mar
Executive Director and Staff Attorney

IELLA is a non-profit 501(c)(3) corporation. Donations are welcome IRS Tax ID 33-0102667.
IELLA's funding sources are: Inland Counties Legal Services/Legal Services Corp. State Bar of California - Legal Services Trust Fund Equal Access to Justice Fund United Way of the Inland Valleys And The Generous Contributions of our Community Donors



*Page 11 of 13*

**ACLU** AMERICAN CIVIL LIBERTIES UNION

**LESBIAN GAY BISEXUAL TRANSGENDER & AIDS PROJECT**

AMERICAN CIVIL LIBERTIES UNION

April 20, 2010

Dear Mr. Booth,

Thank you for contacting us at the ACLU LGBT & AIDS Project. We regret to inform you that we cannot provide legal assistance or advice to you at this time. Unfortunately, due to limited resources, we are only able to provide legal assistance to a small percentage of people who contact us. Enclosed is information explaining the rights of prisoners, a list of book programs/pen pal groups, a list of groups that do advocacy for gay, lesbian, bisexual, transgender people and people living with HIV/AIDS, and advocacy groups in the state from which you are writing.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
LGBT & AIDS PROJECT

This information comes from the ACLU National Prison Project, which can be contacted at:

ACLU National Prison Project
733 15th Street, NW, Ste. 620
Washington, DC 20005
(202) 393-4930 phone
(202) 393-4931 fax
www.aclu.org

We hope that this information is helpful and remind you that this information does not take the place of legal advice provided by an attorney.

Thanks again for your inquiry, and we wish you well.

Sincerely,

Phil Syers
Paralegal
ACLU Lesbian & Gay Rights and AIDS Projects
125 Broad Street, 18th Floor
New York, NY 10004

from the desk of
**Steve Allen, Esq.**        4/9/2010

Michael —
I have received your correspondence.
I will attempt to find representation
for you. I work w/ a number of
excellent attorneys in San Diego who
handle these types of cases. I will be
in touch w/ you once we have something
to talk about. Your paperwork is
being returned with this note. I'm so
sorry this happened to you. Let's hope we
can get you the justice you deserve.

Kind regards,

. . . . . . . .*violence sucks!*

619 231-1058

*Page 13 of 13*

**BARRY D. MILLS**
**The Law Office of Barry D. Mills, P. C.**
3588 Fourth Avenue, Suite 210
San Diego, California 92103
(619) 295-5000
(619) 338-4033 facsimile
MillsLaw@sbcuc.net

March 4, 2010

Michael J. Booth - G27872
CRC 405 18 Low
PO Box 3535
Norco, CA 92860

Re: Case review

Dear Mr. Booth:

Thank you for writing me regarding the horrendous ordeal that you have had to endure while incarcerated. As a gay man, I empathize with your plight. I really wish I could take your case, but, in my opinion, you may have a difficult time prevailing in your civil rights claim. I encourage you to pursue these matters through the criminal justice system as what you have related to me is a matter that requires a criminal remedy.

As I am not taking your case, I am presently not offering you legal advise. However, I wish to share with you a few observations that you should independently evaluate, or seek out other legal counsel to advise you on these matters. As you are now in Norco, I would urge you to seek out the local Legal Referral Services for an attorney that may reside near you.

I believe you will have a difficult time prevailing against the State of California, as the State is immune from liability for injures to or injuries caused by prisoners. (Government Code §844.6). However, you may be able to pursue a federal civil rights action under 42 U.S.C. §1983, against the persons who you believe were responsible for placing you in the cell where you were raped. You would have to specifically name them in the suit. If you were to prevail against them individually, you would have to also show that they were acting "under color of law" in order to pursue the State of California to pay the judgment. It is also my understanding that, because the guards did not physically assault you, you would have to show that they acted with "deliberate indifference" to your pleas, knowing that you would be raped. It is also my understanding that you would be required to cite to the specific constitutional right that was violated - cruel and unusual punishment and due process come to mind.

Page 1 of 2

*(Exhibit I)*
*Page 1 of 2*

Also, please be aware that there are certain time limits in which you must file a claim or otherwise be forever barred from pursue this matter in the civil justice system. Typically, the time runs from the date that you rights were violated. This time limit may be fast approaching as the first anniversary is June of this year. I urge you to determine exactly when any claim would need to be filed.

Again, as I am unable to take your case and be your lawyer is this matter, I wanted to offer you my observations and urge you to consider other sources in evaluating how to proceed. I pray that your pleas will not fall and deaf ears and that the person who raped you will be brought to justice.

Very truly yours,

Barry D. Mills